UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RALPH ABEKASSIS,

                                        Plaintiff,

                    -v-

NEW YORK CITY, NEW YORK; COMMISSIONER
JAMES O'NEILL, *in his official capacity as Police
Commissioner, and all successors therein*; DIRECTOR
JONATHAN DAVID, *in his official capacity as Director,
NYPD License Division*; COMMANDING OFFICER
MICHAEL BARRETO, *in his official capacity as
Commanding Officer of the License Division*,

                                        Defendants.

---

19 Civ. 8004 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Plaintiff Ralph Abekassis, a New York resident, brings this action for declaratory and injunctive relief against the City of New York ("the City"), New York Police Department ("NYPD") Commissioner James O'Neill, NYPD License Division Director Jonathan David, and NYPD License Division Commanding Officer Michael Barreto. Abekassis applied for a license to possess a handgun in his home. Defendants denied his application, based on his prior arrests, criminal summonses, and driving history, including numerous moving violations and license suspensions. Abekassis seeks a declaration that portions of New York City's gun licensing scheme—specifically 38 RCNY § 5-10 (a), (h), (l), and (n)—violate the Second Amendment, facially and as applied, and asks the Court to enjoin defendants from enforcing those provisions.

Before the Court is defendants' motion to dismiss the Complaint. For the reasons that follow, the Court grants that motion in full.

1

## I.     Background

### A.     Statutory and Regulatory Background[1]

#### 1.     The New York State Statutory Scheme

New York State prohibits possession of "firearms," including handguns, without a license. *Kachalsky v. County of Westchester*, 701 F.3d 81, 85 (2d Cir. 2012) (citing N.Y. Penal Law §§ 265.01–265.04, 265.20(a)(3)); *see also Toussaint v. City of New York*, No. 17 Civ. 5576 (NGG), 2018 WL 4288637, at *4 (E.D.N.Y. Sept. 7, 2018).  In New York, individuals may apply for a "premises license" or a "carry license."  *See N.Y. State Rifle & Pistol Ass'n v. City of New York* ("*NYSRP v. City*"), 883 F.3d 45, 52–53 (2d Cir. 2018) (internal quotation marks omitted) (citing N.Y. Penal Law § 400.00(2)(a), (f)), *vacated as moot*, 140 S. Ct. 1525, 1526–27 (2020). "A premises license is specific to the premises for which it is issued," such as a home. *See id.* at 53; *see also* 38 RCNY § 5-01(a) (defining premises license as "a restricted handgun license, issued for a specific business or residence location").

New York Penal Law § 400.00 provides "the exclusive statutory mechanism for the licensing of firearms in New York State." *Kachalsky*, 701 F.3d at 85 (quoting *O'Connor v. Scarpino*, 83 N.Y.2d 919, 920 (1994)).  Under § 400.00, a licensing officer is to issue a firearm license "only after investigation and finding that all statements in a proper application for a license are true."  N.Y. Penal Law § 400.00(1).  To receive a license, § 400.00 requires that an applicant, *inter alia*, be at least age 21, lack convictions for felonies or serious offenses, be of

---

[1] The Court may take judicial notice of the statutory licensing scheme. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes.").  And Abekassis's Complaint, in putting the statutory licensing scheme governing handgun license applications at issue, implicates both the state and city licensing regulations reviewed here.  *See* Dkt. 1 ("Compl.") ¶¶ 49 (New York State law), 65 (New York City law).

good moral character, and be someone for "whom no good cause exists for the denial of the license." *Id.* § 400.00(1)(a)–(c), (n).

### 2.    The New York City Regulatory Scheme

"To obtain a handgun license, an individual must apply to his or her local licensing officer." *NYSRP v. City*, 883 F.3d at 52.  The N.Y. Penal Law specifies that, for New York City, that official is the Police Commissioner.  *See id.* (citing N.Y. Penal Law § 265.00(10)).  The NYPD License Division exercises the Police Commissioner's authority in processing and issuing handgun licenses.  *Id.* (citing 38 RCNY §§ 5-01–5-11).  "Every application triggers a local investigation by police into the applicant's mental health history, criminal history, [and] moral character[.]"  *Kachalsky*, 701 F.3d at 87.  When considering the findings of such investigation, the licensing officer "has considerable discretion in whether to grant a license application." *Toussaint*, 2018 WL 4288637, at *4 (citing *NYSRP v. City*, 883 F.3d at 52).

The relevant grounds for denial of a handgun license are set forth in Title 38 of the Rules of the City of New York ("RCNY") at § 5-10.  Section 5-10 states that an application "may be denied where it is determined that an applicant lacks good moral character or that other cause exists for the denial, pursuant to New York State Penal Law § 400.00(1)."  38 RCNY § 5-10.  It then sets out 14 factors that a licensing official must consider when making a license determination.  These factors assess whether:

(a) The applicant has been arrested, indicted or convicted for a crime or violation except minor traffic violations, in any federal, state or local jurisdiction[;]

(b) [t]he applicant has been other than honorably discharged from the Armed Forces of this country[;]

(c) [t]he applicant has or is reasonably believed to have a disability or condition that may affect the ability to safely possess or use a handgun, including but not limited to alcoholism, drug use or mental illness[;]

(d) [t]he applicant is or has been an unlawful user of, or addicted to, a controlled substance or marijuana[;]

(e) [t]he applicant made a false statement on her/his application, or failed to disclose her/his complete arrest history, including sealed arrests.  Sealed arrests are made available to the License Division pursuant to Article 160 of the Criminal Procedure Law when an application has been made for a license to possess a gun[;]

(f) [t]he applicant is the subject of an order of protection or a temporary order of protection[;]

(g) [t]he applicant has a history of one or more incidents of domestic violence[;]

(h) [t]he applicant has a poor driving history, has multiple driver license suspensions or has been declared a scofflaw by the New York State Department of Motor Vehicles[;]

(i) [t]he applicant has failed to comply with federal, state or local law or with Police Department rules governing possession and use of firearms, rifles, shotguns or ammunition[;]

(j) [t]he applicant has been terminated from employment under circumstances that demonstrate lack of good judgment or lack of good moral character[;]

(k) [t]he applicant has demonstrated an inability to safely store firearms, such as through a history of lost/stolen firearms[;]

(l) [t]he applicant has failed to pay legally required debts such as child support, taxes, fines or penalties imposed by governmental authorities[;]

(m) [t]he applicant fails to cooperate with the License Division's investigation of her/his application or fails to provide information requested by the License Division or required by this chapter[; and]

(n) [there is] [o]ther information [that] demonstrates an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or other good cause for the denial of the license.

*Id.* § 5-10(a)–(n).  Section 5-10 directs that the License Division "shall consider all relevant

factors, including but not limited to the number, recency and severity of incidents and the

outcome of any judicial or administrative proceedings."  *Id.* § 5-10.

### B.     Factual Background[2]

#### 1.     The Parties

Plaintiff Abekassis is age 33 and resides in New York City.[3]  Compl. ¶¶ 4, 18–19.

Defendant O'Neill, at the time of the filing of the Complaint, was the NYPD Police

Commissioner, and, in that role, also served as the "Pistol Licensing Officer" for New York

City.[4]  *Id.* ¶ 5a.  In that position, O'Neill set the customs, policies, and procedures for the NYPD

units that address handgun licenses.  *Id.* ¶ 6.  Defendant Barreto, who works for the NYPD

License Division, is authorized to approve or disapprove handgun license applications in the first

instance.  *Id.* ¶ 9.  If Barreto denies an application, the applicant may file an appeal with the

NYPD License Division's Appeals Unit within 30 days.  *Id.* ¶ 12.  Defendant David, as the

director of the Appeals Unit, is authorized to make a final decision on handgun license

applications that have been appealed.  *Id.* ¶¶ 13–14.

#### 2.     Abekassis's Application for a Premises Handgun License

In 2018, Abekassis applied to the NYPD License Division for a premises handgun

license.  *Id.* ¶¶ 22–23.  On January 24, 2019, Barreto denied the application.  *Id.* ¶ 25.  Barreto

stated that the denial was based on Abekassis's two prior arrests (one for arson; the other for

---

[2] The facts are drawn primarily from the Complaint.  For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of Abekassis.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The factual history leading to the denial of Abekassis's application for a premises license does not appear to be in dispute.

[3] The Complaint pleads that Abekassis is both a resident of Kings County, New York, *see* Compl. ¶ 4, and Queens County, New York, *see id.* ¶¶ 19, 67.  This factual contradiction within the Complaint has no bearing here.

[4] O'Neill retired as NYPD Police Commissioner on December 2, 2019.  Dkt. 19 ("Def. Reply") at 1 n.1.  Because the Complaint names O'Neill in his official capacity, Abekassis's suit for declaratory and injunctive relief survives O'Neill's retirement, and seeks relief today against the current Commissioner, Dermot Shea.

aggravated unlicensed operation of a motor vehicle in the third degree); five criminal summonses (for failure to pay commercial tax, improper license plates, improper registration, being in a park after dark, and operating a boat without registration numbers); and driving history, including 16 moving violations[5] and six license suspensions.[6] *Id.* ¶¶ 26, 30, 32.

On February 14, 2019, Abekassis filed an administrative appeal with the NYPD License Division's Appeals Unit. *Id.* ¶ 28. In the appeal, Abekassis noted that he had no criminal convictions. He also provided context for his arrests and summonses. *See id.* ¶ 30; *see also id.* ¶ 79. As to the two arrests, Abekassis stated that (1) on October 24, 2001, he was arrested at age 16 for arson when he and a friend were caught playing with a lighter in an apartment building, and he was not prosecuted for that charge; and (2) on July 11, 2006, at age 21, he was arrested for aggravated unlicensed operation of a motor vehicle in the third degree for failure to pay tickets, and he pled guilty to a reduced non-criminal offense. *See id.*; *see also id.* ¶¶ 80–81. As to his driving history, he stated that he had received 14, not 16, moving violations over the course of 10 years, paid the fines for his unanswered tickets as soon as he had become aware of them, and completed an accident prevention course. *See id.* ¶ 30. Abekassis argued that on these bases, his application should be granted. *See id.*

On or about April 23, 2019, the License Division's Appeals Unit issued a "Notice of Disapproval After Appeal" ("Notice of Disapproval"). *Id.* ¶ 31. It affirmed the denial of Abekassis's handgun license application. *Id.* In affirming that denial, the Appeals Unit relied on N.Y. Penal Law § 400.00, which states that "no license shall be issued except for an applicant

---

[5] The Appeals Unit later determined that Abekassis had 14, not 16, moving violation summonses and related non-criminal convictions. *See* Compl. ¶ 32.

[6] The Appeals Unit later determined that Abekassis had nine, not six, license suspensions. *See* Compl. ¶ 32.

. . . (b) of good moral character . . . and; (n) concerning whom no good cause exists for the denial of the license." *Id.* ¶ 32 (alterations in original) (quoting N.Y. Penal Law § 400.00(1)(b), (n)).  It noted that "Section 5-10 . . . provides a list of what shall be considered in assessing moral character and whether good cause exists for a denial." *Id.*  As to Abekassis's application, the Appeals Unit found the following § 5-10 factors relevant: (1) the facts and circumstances surrounding his arrests, *see* 38 RCNY § 5-10(a); (2) his driving record and driver's license suspensions, *see id.* § 5-10(h); and (3) other information reflecting a lack of concern for his own safety or the safety of others, *see id.* § 5-10(n).  Compl. ¶ 32; *see also id.* ¶ 34.  The Notice of Disapproval did not cite § 5-10(l), which concerns an applicant's failure to pay legally required debts, including government-imposed fines or penalties.

As to Abekassis's arrest record, the Appeals Unit recounted Abekassis's arrest at age 15 for second-degree arson, a felony which the New York City Law Department declined to prosecute, and his arrest for aggravated unlicensed operation in the third degree, after which he pled guilty to a non-criminal charge of operating a vehicle without a license.  *Id.* ¶ 32.  As to Abekassis's driving record, the Appeals Unit noted that Abekassis had received 14 moving violations, and that his license had been suspended nine times (five for unpaid fines and four for non-scofflaw reasons).  *Id.*  On this basis, the Appeals Unit found that Abekassis's history "demonstrate[s] a lack of concern[] for himself and others," and denied the application.  *Id.*

Notwithstanding the license denial, the Complaint alleges that Abekassis intends to possess a handgun in his home for self-protection, and asserts that such possession will likely subject him to criminal prosecution.  *Id.* ¶¶ 35–36.  If he is convicted of unlawful possession of a firearm, the Complaint alleges, he will be prevented from possessing a gun lawfully in the future. *Id.* ¶ 37.  The Complaint asserts that Abekassis "should not be forced to choose between

7

exercising his fundamental and pre-existing right to possess firearms in his home for self-defense and being subjected to criminal prosecution." *Id.* ¶ 38.

### 3.   This Lawsuit

On August 27, 2019, Abekassis filed the Complaint, which asserts that the denial of Abekassis's premises license was unlawful.  It claims that 38 RCNY § 5-10(a), (h), (l), and (n) all violate the Second Amendment, both facially and as applied to Abekassis's license denial, and that all are preempted by N.Y. Penal Law § 400.00.  *See id.* ¶¶ 136–39, 144–46.  The Complaint further claims that defendants' application of the provisions of the N.Y. Penal Laws that criminalize the unlicensed possession of firearms—N.Y. Penal Law §§ 265.02(5)(i), 265.03(2), 265.04(2), and 265.15(6)—would be unconstitutional if applied to Abekassis.  *See id.* ¶¶ 140–43.

On November 26, 2019, defendants filed a motion to dismiss, Dkt. 12; a supporting memorandum of law, Dkt. 14 ("Def. Mem."); and the declaration of Aimee K. Lulich, Esq., Dkt. 13.  On November 27, 2019, the Court issued an order directing Abekassis to either amend his complaint or oppose the motion to dismiss.  Dkt. 15.  On December 26, 2019, Abekassis filed a memorandum in opposition to the motion to dismiss.  Dkt. 18 ("Pl. Mem.").  On January 10, 2020, defendants filed a reply memorandum.  Def. Reply.

## II.   Applicable Legal Standards

### A.   Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is

properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

## III.    Discussion

Defendants move to dismiss Abekassis's claims. They argue that (1) Abekassis lacks standing to challenge 38 RCNY § 5-10(l), because that provision was not a basis for the denial of his license application; (2) the Complaint does not plead a plausible Second Amendment claim; (3) the Court should decline to exercise supplemental jurisdiction over his state-law preemption claim; and (4) even if the Court exercised such jurisdiction and reached that issue, 38 RCNY § 5-10 is not preempted by state law. The Court addresses each in turn.

### A.    Standing to Challenge 38 RCNY § 5-10(l)

At the threshold, defendants argue that Abekassis lacks standing to challenge 38 RCNY § 5-10(l) because the License Division and Appeals Unit did not rely on that specific factor in denying Abekassis's residential firearm permit application. *See* Def. Mem. at 13–14. Section 5-10(l) requires that a licensing official consider—in the "good moral character" and "good cause" analyses—an applicant's failure "to pay legally required debts such as child support, taxes, fines or penalties imposed by governmental authorities." 38 RCNY § 5-10(l). Abekassis argues that he has standing because, even though the Notice of Disapproval did not invoke § 5-10(l), it stated that his "[driver's] license was suspended five times *due to unpaid fines* and on four other occasions for non-scofflaw related reasons." Pl. Mem. at 22 (emphasis in original) (citing Compl. ¶ 32).

The Court finds that Abekassis does not have standing to challenge this provision.

To establish Article III standing, a plaintiff must establish the "irreducible constitutional minimum" of the following three elements: (1) injury-in-fact, meaning there is "an actual or imminent" and "concrete and particularized" harm to a "legally protected interest"; (2) causation, which requires the injury to be "fairly . . . trace[able]" to the challenged action of the defendant; and (3) redressability, meaning that it must be "likely, as opposed to merely speculative," that a favorable decision by a court will redress the injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted) (alteration in original). To survive a motion to dismiss for lack of standing, "general factual allegations of injury resulting from the defendant's conduct may suffice," *id.* at 561, but "a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing," *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003).

Abekassis asks the Court to treat the Notice of Disapproval's reference to Abekassis's license suspensions due to unpaid fines as connoting that the Appeals Unit relied, *sub silentio*, on § 5-10(l) to deny his application. *See* Pl. Mem. at 22. The Court declines to so construe the Notice of Disapproval. The Notice of Disapproval clearly refers to these license suspensions as factual context germane to a separate factor—§ 5-10(h), the applicant's driving record—which it explicitly cited in denying Abekassis's application. *See* Compl. ¶ 32. The License Division's Appeals Unit found the five scofflaw suspensions relevant to Abekassis's driving record when considered alongside Abekassis's other driving infractions, which included four other license suspensions—unrelated to a failure to pay fines—and 14 moving violations. *See id.* Critically, the Notice of Disapproval cites § 5-10(h), the driving-record factor, as a basis for its decision, but it does not cite to § 5-10(l). *See id.* The Appeals Unit thus did not conclude that Abekassis lacked good moral character because he failed to pay fines *per se*, but because of Abekassis's

troublesome overall driving record, of which the scofflaw suspensions were but one of a number of relevant data points.

The analysis by the Appeals Unit thus does not support Abekassis's claim that it (or the License Division, whose decision it upheld) relied on § 5-10(l).  Nor does the Appeals Unit's analysis suggest that it would have regarded Abekassis's non-payment of vehicular fines as a basis, in isolation, to deny him the license.

Accordingly, even construing the facts in the light most favorable to Abekassis, the Court cannot find that the License Division or Appeals Unit relied on § 5-10(l) in denying Abekassis's application.  And because 38 RCNY § 5-10(l) was not a factor on which the license denial in this case was based, Abekassis cannot demonstrate an injury-in-fact that is "fairly traceable" to § 5-10(l).  *See Lujan*, 504 U.S. at 560 (alterations and citation omitted).  The Court therefore dismisses the Complaint's claims based on § 5-10(l), including Abekassis's Second Amendment challenge to that provision, for lack of standing.

## B.   Second Amendment Challenges to 38 RCNY § 5-10(a), (h), and (n)

Abekassis challenges the provisions of 38 RCNY § 5-10 on which the License Division relied—subsections (a), (h) and (n)—both facially and as applied to him.  The Court first reviews the framework the Second Circuit has developed for assessing firearms regulations under the Second Amendment, and determines that, under that framework, Abekassis's facial and as-applied challenges to 38 RCNY § 5-10 merit intermediate scrutiny.  The Court next analyzes Abekassis's facial challenge, and then his as-applied challenge.

### 1.   Framework for Analyzing Second Amendment Challenges

The Second Amendment provides that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held, for the first time,

11

that the Amendment "protects an 'individual right to possess and carry weapons in case of confrontation[.]'" *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018) (quoting *Heller*, 554 U.S. at 592). "The core of this protection is 'the right of law-abiding responsible citizens to use arms in defense of hearth and home.'" *Mishtaku v. City of New York*, No. 14 Civ. 839 (VSB), 2015 WL 13002182, at *3 (S.D.N.Y. May 4, 2015) (quoting *Heller*, 554 U.S. at 635), *aff'd sub nom. Mishtaku v. Espada*, 669 F. App'x 35 (2d Cir. 2016). The Supreme Court has since held that the Amendment's protection applies, via the Fourteenth Amendment, to firearms regulation by states and localities. *See McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

The Second Amendment right articulated in *Heller* and *McDonald*, however, "is not unlimited." *Heller*, 554 U.S. at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* On the contrary, the Supreme Court cautioned in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. That list of "presumptively lawful regulatory measures," the Court added, provides "only . . . examples" and "does not purport to be exhaustive." *Id.* at 627 n.26. In *McDonald*, the Court similarly observed that "incorporation does not imperil every law regulating firearms." *McDonald*, 561 U.S. at 786.

Although *Heller and McDonald* are explicit that some restrictions on gun possession and carrying are compatible with the Second Amendment, neither decision "delineated the precise scope of the Second Amendment or the standards by which lower courts should assess the constitutionality of firearms restrictions." *N.Y. State Rifle & Pistol Ass'n v. Cuomo* ("*NYSRP v.*

*Cuomo*"), 804 F.3d 242, 254 (2d Cir. 2015); *see also Kachalsky*, 701 F.3d at 88–89 ("[I]n many ways, [*Heller*] raises more questions than it answers. . . .   What we do not know is . . . the standards for determining when and how the [Second Amendment] right can be regulated by a government.  This vast '*terra incognita*' has troubled courts since *Heller* was decided." (quoting *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011))).

The Second Circuit has adopted a two-step framework to assess whether a firearm restriction violates the Second Amendment.  *See NYSRP v. Cuomo*, 804 F.3d at 254; *see also, e.g.*, *Jimenez*, 895 F.3d at 232; *NYSRP v. City*, 883 F.3d at 55.  Under that test, a court must (1) "determine whether the challenged legislation impinges upon conduct protected by the Second Amendment," and if so, (2) "next determine and apply the appropriate level of scrutiny." *NYSRP v. City*, 883 F.3d at 55 (quoting *NYSRP v. Cuomo*, 804 F.3d at 254, 257).

####    a.    Step One: Whether the Second Amendment Applies

Defendants do not dispute that 38 RSNY § 5-10 impinges on conduct protected by the Second Amendment.  The Court here assumes *arguendo* that it does, consistent with the Second Circuit's post-*Heller* treatment of firearms restrictions.  In a series of challenges to such laws, the Circuit has repeatedly "'proceed[ed] on the assumption that' the regulations at issue restrict activity protected by the Second Amendment." *Toussaint*, 2018 WL 4288637, at *5 (quoting *NYSRP v. Cuomo*, 804 F.3d at 257); *see also Jimenez*, 895 F.3d at 234; *NYSRP v. City*, 883 F.3d at 55; *Corbett v. City of New York*, No. 18 Civ. 7022 (KPF), 2019 WL 2502056, at *9 (S.D.N.Y. June 17, 2019), *aff'd*, --- F. App'x ---, No. 19-2152, 2020 WL 2988856 (2d Cir. June 4, 2020).  As in these cases, however, this Court need not conclusively "decide whether that is so, because, as explained below [section 5-10] 'pass[es] constitutional muster' under intermediate scrutiny." *Toussaint*, 2018 WL 4288637, at *5 (alterations in original) (quoting *NYSRP v. City*, 883 F.3d at 55).

*b.* *Step Two: What Level of Scrutiny Applies*

The Supreme Court has yet to define the level of scrutiny to apply to Second Amendment

challenges.[7]  The Second Circuit, like many sister circuits, has declined to adopt a single tier of

scrutiny for assessing Second Amendment issues, and instead calibrates the standard depending

on the characteristics of the law under review.  In determining the proper level of scrutiny, the

Circuit has considered two factors: "(1) 'how close the law comes to the core of the Second

Amendment right', and (2) 'the severity of the law's burden on the right.'"  *NYSRP v. Cuomo*,

804 F.3d at 258 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)).

Strict, intermediate, or non-heightened scrutiny may result from assessment of these

factors.  *See NYRSP v. City*, 883 F.3d at 55.  Strict scrutiny is warranted where "[l]aws . . .  place

substantial burdens on core rights[.]"  *Jimenez*, 895 F.3d at 234.  Intermediate scrutiny is

warranted in the far more common context in which "laws . . . place either insubstantial burdens

on conduct at the core of the Second Amendment or substantial burdens on conduct outside the

core of the Second Amendment (but nevertheless implicated by it)[.]"  *Id.*  Finally, where the

regulation at issue "neither implicate[s] the core protections of the Second Amendment nor

substantially burden[s] their exercise," heightened scrutiny is not warranted.  *NYSRP v. City*,

---

[7] The absence of definite guidance from the Court on this point has been noted recently by
several Justices.  *See Rogers v. Grewal*, 140 S. Ct. 1865, 1866 (2020) (mem.) (Thomas, J.,
dissenting) ("[L]ower courts have struggled to determine the proper approach for analyzing
Second Amendment challenges."); *N.Y. State Rifle & Pistol Ass'n v. City of New York*,
140 S. Ct. 1525, 1527 (2020) (Kavanaugh, J., concurring) ("I share Justice Alito's concern that
some federal and state courts may not be properly applying *Heller* and *McDonald*."); *Silvester v.
Becerra*, 138 S. Ct. 945, 947 (2018) (mem.) (Thomas, J., dissenting) ("This Court has not
definitively resolved the standard for evaluating Second Amendment claims.").

888 F.3d at 56 (quoting *NYSRP v. Cuomo*, 804 F.3d at 258); *see also United States v. Decastro*, 682 F.3d 160, 168–69 (2d Cir. 2012) (not applying heightened scrutiny).[8]

Abekassis agrees that the Second Circuit's two-factor test applies to the case at hand.  He urges that 38 RCNY § 5-10 merits strict scrutiny under that framework.  *See* Pl. Mem. at 2–3, 7. The Court, however, applying that test, finds, with defendants, that intermediate scrutiny is warranted.

### i.      The Core of the Second Amendment Right

Abekassis argues that § 5-10 implicates the Second Amendment's core because § 5-10 governs the issuance of licenses that enable an individual to possess a firearm in the home for self-defense.  *See* Pl. Mem. at 4.  Abekassis is correct that § 5-10's licensing requirement regulates gun ownership in the home.  However, the features and function of § 5-10 are such that it does not trigger the application of strict scrutiny.

Abekassis is correct that Second Amendment rights are at their strongest when they concern "protecting oneself in one's home with a weapon in common use[.]"  *Jimenez*, 895 F.3d

---

[8] The alternative to this approach, urged by some jurists and scholars, is to "look solely to the text, history, and tradition of the Second Amendment" in resolving any particular challenge. *Kachalsky*, 701 F.3d at 89 n.9; *see, e.g.*, *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 702 (6th Cir. 2016) (Batchelder, J., concurring) ("[The two-step test] fails to give adequate attention to the Second Amendment's original public meaning . . . .  And it is *that* meaning—as *Heller* and *McDonald* make unmistakably clear—informed as it is by the history and tradition surrounding the right, that counts." (emphasis in original)); *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."); *cf. Moore v. Madigan*, 702 F.3d 933, 935–37 (7th Cir. 2012) (Posner, J.) (discussing self-defense in the eighteenth century to analyze the validity of current firearm restrictions).  The Second Circuit has, however, foregone this mode of analysis, while recognizing that under *Heller*, "where a state regulation is entirely inconsistent with the protections afforded by an enumerated right—as understood through that right's text, history, and tradition—it is an exercise in futility to apply means-end scrutiny," because the same outcome (invalidation of the state regulation) would result.  *Kachalsky*, 701 F.3d at 89 n.9

at 234 (citing *Heller*, 554 U.S. at 634–35); *see also Kachalsky*, 701 F.3d at 89 ("What we know

from [*Heller* and *McDonald*] is that Second Amendment guarantees are at their zenith within the

home."). However, the Supreme Court in *Heller* was clear that this elevated interest belongs

only to "*law-abiding*, *responsible* citizens to use arms in defense of hearth and home." *Heller*,

554 U.S. at 635 (emphasis added). As the Second Circuit has put the point: "The Supreme

Court thus identified the core of Second Amendment protections by reference not only to

particular uses and particular weapons but also to particular persons, namely those who are 'law-

abiding and responsible.'" *Jimenez*, 895 F.3d at 234–35.

Heeding this analysis, the Second Circuit has "consistently included the 'law-abiding and

responsible' qualification when identifying the Second Amendment's core protections." *Id.*

at 235. It has held that "heightened scrutiny is triggered only by those restrictions that . . .

operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm

for self-defense (or for other lawful purposes)." *Decastro*, 682 F.3d at 166; *accord NYSRP v.*

*City*, 883 F.3d at 56; *NYSRP v. Cuomo*, 804 F.3d at 259; *Kwong v. Bloomberg*, 723 F.3d 160,

167 (2d Cir. 2013); *Kachalsky*, 701 F.3d at 93; *see also United States v. Bryant*, 711 F.3d 364,

369 (2d Cir. 2013) ("We read [*Heller*'s] exegesis as an implicit limitation on the exercise of the

Second Amendment right to bear arms for 'lawful purpose[s],' and a limitation on ownership to

that of 'law-abiding, responsible citizens[.]'" (internal citations omitted)).[9] Other circuits have

taken the same approach. *See Jimenez*, 895 F.3d at 235 (collecting cases).

---

[9] In different cases, the Second Circuit has considered a particular law's infringement on the rights of "law-abiding, responsible citizens" as relevant to factor one (the core of the right), and to factor two (the severity of the burden). *Compare Jimenez*, 895 F.3d at 235 (factor one), *with NYSRP v. City*, 883 F.3d at 56 (factor two). Regardless, the fact that New York City's restriction substantially burdens gun possession only as to persons outside this group supports the use of intermediate, as opposed to strict, scrutiny.

Here, critically, although the state licensing scheme, and § 5-10's implementation of it within New York City, apply to gun ownership in the home, they do not implicate the population as a whole. Instead, they are explicitly aimed at filtering out those citizens who, as revealed by the application of the § 5-10 factors, are not law-abiding or responsible. To that end, the New York Penal Laws authorize local officers to investigate the background of license applicants. *See Kachalsky*, 701 F.3d at 87. And § 5-10's list of factors bearing on an individual's suitability for licensure, including the three at issue here—requiring consideration of an applicant's arrests, indictments, and convictions; poor driving history, multiple driver's license suspensions, and scofflaw status; and concern for the safety of himself and others, *see* 38 RCNY § 5-10(a), (h), (n)—are germane to assessing whether the particular applicant is law-abiding and responsible. *See Toussaint*, 2018 WL 4288637, at *6 (applying intermediate scrutiny to challenge of N.Y. Penal Law § 400.00 and 38 RCNY § 5-10 because, *inter alia*, plaintiff was not a "law-abiding" citizen falling within the Second Amendment's core). Thus, rather than facially infringing on rights protected by the Second Amendment, the § 5-10 factors, including those implicated here, are aimed at limiting gun possession to people who have such a right, by helping to identify the "'law-abiding and responsible' persons whose interests in possessing firearms are at the Amendment's core." *Jimenez*, 895 F.3d at 235.

The Court accordingly holds—consistent with other courts that have considered similar challenges—that, although the New York State licensing scheme and the New York City law applying it squarely implicate gun possession in the home, they do not implicate the Second Amendment's core, because they deny such possession only to persons who are found not to be "law-abiding and responsible." As Judge Broderick has put the point: "[T]he relevant sections of the RCNY merely restrict access to handguns for the subset of individuals who lack the

characteristics for safe possession of a handgun[.]"  *Mishtaku*, 2015 WL 13002182, at *5; *see also Aron v. Becker*, 48 F. Supp. 3d 347, 371 (N.D.N.Y. 2014) (applying intermediate scrutiny to N.Y. Penal Law § 400.00's good-cause analysis, which "burden[s] only the narrow class of persons who are adjudged to lack the characteristics necessary for the safe possession of a handgun").  This first factor thus indicates that intermediate, not strict, scrutiny is in order.

           ii.         The Severity of § 5-10's Burden on That Right

In assessing the severity of a challenged restriction on Second Amendment protections, courts look to "[t]he scope of the legislative restriction and the availability of alternatives" to procure firearms.  *NYSRP v. City*, 883 F.3d at 56 (quoting *NYSPR v. Cuomo*, 804 F.3d at 259). The epitome of a severe burden on the Second Amendment's core right would be a categorical ban on possession of handguns in the home, as in *Heller*.  *See NYSRP v. City*, 883 F.3d at 56.  In contrast, "marginal, incremental or even appreciable restraint[s] on the right to keep and bear arms" present lesser burdens.  *Decastro*, 682 F.3d at 166.  Only "substantial burden[s] on the ability of law-abiding citizens to possess and use a firearm" warrant heightened scrutiny.  *See id.*; *see also Kachalsky*, 701 F.3d at 93.  "No 'substantial burden' exists—and hence heightened scrutiny is not triggered—'if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense.'"  *NYSRP v. Cuomo*, 804 F.3d at 259 (quoting *Decastro*, 682 F.3d at 168).

    In considering the severity of a regulatory burden, the Second Circuit has often— particularly in the context of facial challenges—considered the challenged restriction's effect on the Second Amendment rights of *all* law-abiding citizens.  *See NYRSP v. Cuomo*, 804 F.3d at 259 (ban on semiautomatic weapons and high-capacity magazines held not severe because "numerous alternatives remain[ed] for law-abiding citizens to acquire a firearm for self-defense" (internal quotation marks and citation omitted)); *Kachalsky*, 701 F.3d at 93 (requirement that

applicants for concealed carry license show "proper cause"—*i.e.*, a special need for

self-protection that exceeds that of the general population or people of the same profession—

held severe because it placed "substantial limits on the ability of law-abiding citizens to possess

firearms for self-defense in public"); *see also Henry v. County of Nassau*, --- F. Supp. 3d ---,

No. 17 Civ. 6545 (DRH), 2020 WL 1185283, at *9 (E.D.N.Y. Mar. 12, 2020) (burden of N.Y.

Penal Law § 400.00 and Nassau County policies held not severe where order of protection issued

against plaintiff resulted in a "total ban on firearm ownership for him," but he had not alleged

that Nassau County had "implemented a policy banning all firearm ownership for all people").

So analyzing § 5-10, the burden it imposes on the core Second Amendment right is less

than substantial.  That is because § 5-10 is a licensing scheme.  It is not an outright prohibition

on possession of a class of weapons.  And § 5-10 does not reflexively obligate the denial of a

license; the presence of no one § 5-10 factor, or combination of factors, mandates the denial of a

license.  Instead, the scheme reposes discretion—initially in the License Division and thereafter

in the reviewing Appeals Unit—in assessing holistically what the relevant factors indicate about

the applicant's moral character and whether they supply good cause to deny the license.  *See*

38 RCNY § 5-10 (an application "*may* be denied where it is determined that an applicant lacks

good moral character or that other good cause exists for the denial" after considering the 14

factors (emphasis added)); *see also Torcivia v. Suffolk County*, 409 F. Supp. 3d 19, 38

(E.D.N.Y. 2019) ("The fact that the pistol licensing provisions are discretionary, and not

mandatory, only strengthens the Court's conclusion.  By permitting a licensing official to make a

case-by-case, individualized determination as to an individual's fitness to hold a license, these

provisions permit the government to more narrowly prescribe the circumstances under which an

individual's Second Amendment rights may be burdened.").

To be sure, there is no alternative scheme to procure a handgun license for the home; a person whose license application is denied and who fails on appeal (and, if brought, in an Article 78 challenge) to overturn that result has no remedy other than to reapply and attempt a stronger showing.  But, given the focus and nature of the listed factors, a law-abiding, responsible citizen should be able to satisfy § 5-10 and obtain a premises license.  *Cf. Corbett*, 2019 WL 2502056, at *1–2 (explaining, in context of N.Y. Penal Law § 400.00, that a premises license "is not difficult to come by" (citing *People v. Hughes*, 22 N.Y.3d 44, 50 (2013)). Abekassis notably does not plead or point to any pattern of license denials under § 5-10 to law-abiding and responsible persons.  And the Court has not otherwise been made aware of license denials to such persons.

That, however, is not the end of the analysis.  In some cases, in evaluating this factor, the Second Circuit has examined the severity of the burden that the challenged regulation imposes on the *individual* plaintiff.  *See, e.g.*, *Jimenez*, 895 F.3d at 236 (burden presented by § 922(g)(6), which makes it unlawful for those dishonorably discharged from Armed Forces to possess firearms or ammunition, held severe because plaintiff—who had been dishonorably discharged—could not obtain firearms or ammunition and had no alternatives to do so); *NYSRP v. City*, 883 F.3d at 57 (rule prohibiting individual with premises license from transporting handgun licensed in New York City outside of city limits held not to place substantial burden on plaintiff, who was prevented from taking his city-licensed gun to second home, because he could obtain another handgun license there).  Abekassis urges this mode of analysis.  Under it, Abekassis's Second Amendment rights unavoidably have been severely burdened by application of § 5-10.  That is because he has been denied a handgun license, and because the RCNY's provisions for other firearms (shotguns and rifles) licenses appear to track § 5-10.  *See* Pl. Mem.

at 6.  Therefore, as Abekassis observes, the License Division and Appeals Units decisions appear effectively to block him, absent changed circumstances, from lawfully possessing any kind of firearm in his home.  *See id.*

Even assuming, however, that this mode of analysis were used to evaluate the burden imposed by § 5-10—*i.e.*, that the burden is measured by its impact on Abekassis alone and found substantial—intermediate scrutiny would still be in order under the Second Circuit's analysis in *Jimenez*.  The Court there found a "substantial burden[] on [plaintiff's] non-core rights," and held that these are "usually analyzed . . . with intermediate scrutiny."  *Jimenez*, 895 F.3d at 236. Use of intermediate scrutiny further aligns with the approach taken within the Circuit, post-*Heller*, to Second Amendment claims.

The application of intermediate scrutiny in this case is, finally, in line with the practice of the Second Circuit, which to date has not applied strict scrutiny to a Second Amendment claim. *See, e.g.*, *Mishtaku*, 669 F. App'x at 35 (2d Cir. 2016) ("We apply intermediate scrutiny to laws implicating the Second Amendment." (citation omitted)); *see also Doe No. 1 v. Putnam County*, 344 F. Supp. 3d 518, 537 (S.D.N.Y. 2018) ("This is in accord with the general practice in the Second Circuit of applying intermediate scrutiny to a wide variety of laws implicating the Second Amendment.").  Relevant here, the Circuit has used intermediate scrutiny to evaluate facial and as-applied challenges to licensing schemes and other "restrictions that fall short of being universal prohibitions on entire classes of firearms."  *Toussaint*, 2018 WL 4288637, at *5; *see, e.g.*, *Jimenez*, 895 F.3d at 236–38 (applying intermediate scrutiny in upholding statute prohibiting dishonorably discharged veterans from possessing firearms); *NYSHR v. City*, 883 F.3d at 62–64 (same in upholding provision of New York City licensing scheme that did not allow those with premises licenses to take their firearms out of the city); *Kwong*, 723 F.3d

at 168–69 (same in upholding residential handgun licensing fee); *Kachalsky*, 701 F.3d at 96–97 (same in upholding "proper cause" requirement for carry permits).

District courts in this Circuit have likewise applied intermediate scrutiny to challenges to, and arising under, the licensing scheme at issue here.  *See, e.g.*, *Mishtaku*, 2015 WL 13002182, at *5 (challenge to N.Y. Penal Law § 400.00 and 38 RCNY § 5-10 for denial of premises license); *Toussaint*, 2018 WL 4288637, at *6–7 (challenge to N.Y. Penal Law § 400.00 and 38 RCNY § 5-10 for denial of carry license).[10]  In one such case, the Second Circuit affirmed the use of intermediate scrutiny in assessing a challenge to N.Y. Penal Law § 400.00 and 38 RCNY § 5-10 by a plaintiff who had been denied a premises license.  *See Mishtaku*, 669 F. App'x at 35–36. Intermediate scrutiny has also been applied by most courts, including the Second Circuit and courts within it, "when reviewing statutes or laws that may restrict the possession of handguns in the home."  *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 86 F. Supp. 3d 249, 259

---

[10] Courts have also applied intermediate scrutiny to N.Y. Penal Law § 400.00 when the New York City licensing scheme was not also at issue.  *See Weinstein v. Krumpter*, 386 F. Supp. 3d 220, 231–32 (E.D.N.Y. 2019) (applying intermediate scrutiny to N.Y. Penal Law § 400.00's allowance of license revocation for felony or serious offense conviction); *Aron*, 48 F. Supp. 3d at 371 (applying intermediate scrutiny to N.Y. Penal Law § 400.00's good moral character and good cause requirements, under which plaintiff was denied residential firearm permit based on a lack of "good judgment"); *Sibley v. Watches*, --- F. Supp. 3d ---, No. 19 Civ. 6517 (FPG), 2020 WL 2525771, at *7–8 & n.4 (W.D.N.Y. May 18, 2020) (applying intermediate scrutiny to N.Y. Penal Law § 265.01(1), which criminalizes handgun possession without a license and "work[s] together" with § 400.00); *Libertarian Party of Erie Cnty. v. Cuomo*, 300 F. Supp. 3d 424, 443–45 (W.D.N.Y. 2018) (applying intermediate scrutiny to facial and as-applied challenges to N.Y. Penal Laws §§ 265.00(3), 265.01–265.04, 265.20(a)(3), and 400.00, where applicant was denied premises license because he had been arrested 50 times, served four terms of imprisonment, and repeatedly failed to make child support payments).

(S.D.N.Y. 2015) (collecting cases), *aff'd*, *NYSRP v. City*, 883 F.3d 45, *vacated as moot*, 140 S. Ct. 1525, 1526–27 (2020).[11]

The Court accordingly will apply intermediate scrutiny to Abekassis's facial and as-applied challenges.[12]

### 3.    Application of Intermediate Scrutiny to Abekassis's Challenges

A court applying intermediate scrutiny asks whether the statute at issue is substantially related to the achievement of an important government interest.  *See NYSRP v. Cuomo*, 804 F.3d at 261; *Kachalsky*, 701 F.3d at 96.  "To survive intermediate scrutiny, the 'fit between the challenged regulation [and the government interest] need only be substantial, not perfect.'"  *NYSRP v. Cuomo*, 804 F.3d at 261 (alteration in original) (citation omitted).  Unlike with strict scrutiny, courts applying intermediate scrutiny need "not ensure that the statute is 'narrowly

---

[11] *See also, e.g.*, *Stimmel v. Sessions*, 879 F.3d 198, 206 (6th Cir. 2018) (declining to apply strict scrutiny where plaintiff was denied ability to purchase a firearm to "defend his home and family" because the 'risk inherent in firearms' distinguishes the right to keep and bear arms 'from other fundamental rights that have been held to be evaluated under a strict scrutiny test'" (citation omitted)); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 965–66 (9th Cir. 2014) (applying intermediate scrutiny to regulation governing storage of handguns in home); *United States v. Chovan*, 735 F.3d 1127, 1139–42 (9th Cir. 2013) (applying intermediate scrutiny in upholding federal ban of possession of firearms, including in homes, by persons convicted of misdemeanor domestic violence crimes); *Avitabile v. Beach*, 368 F. Supp. 3d 404, 414, 418–19 (N.D.N.Y. 2019) (applying intermediate scrutiny to ban of possession of tasers and stun guns, which applied in homes).

[12] In the rare instance in which courts—all outside this Circuit—have applied strict scrutiny to Second Amendment claims, the regulations at issue have been more blanket and restrictive than the licensing scheme at issue here.  *See, e.g.*, *Gowder v. City of Chicago*, 923 F. Supp. 2d 1110, 1117, 1120–24 (N.D. Ill. 2012) (invalidating Chicago ordinance that forbade residential permits for anyone formerly convicted of a misdemeanor—"basically provid[ing] that anyone convicted of a nonviolent misdemeanor offense relating to a firearm [was] forever barred from exercising his constitutional right to possess a firearm in his own home for self-defense"—under both strict scrutiny and a "text, history, and tradition" analysis).

tailored' or the 'least restrictive available means to serve the stated governmental interest.'" *Id.* (citation omitted).

In applying intermediate scrutiny in the context of Second Amendment challenges, the Second Circuit has recognized "that state regulation of the right to bear arms 'has always been more robust' than analogous regulation of other constitutional rights.  So long as the defendants produce evidence that 'fairly support[s]' their rationale, the laws will pass constitutional muster." *Id.* (alterations in original) (citations omitted).

### a.    Abekassis's Facial Challenge

Abekassis first argues that 38 RCNY § 5-10 is facially unconstitutional.  *See* Pl. Mem. at 4 n.1, 6; *see also* Compl. ¶¶ 107, 138–39.  That claim is unpersuasive.

To succeed in a facial constitutional challenge, "the challenger must establish that no set of circumstances exists under which the [regulation] would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  The Supreme Court has expressed disfavor of facial challenges.[13]  It has emphasized that in determining whether a law is facially invalid, "we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."  *Wash. State Grange*, 552 U.S. at 449–50 (2008).  And the Second Circuit has counseled caution in the specific context of a facial Second Amendment challenge to a statute.  In *NYSRP v. Cuomo*, for example, the Circuit described "a facial challenge to a legislative enactment [a]s

---

[13] *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008) ("Facial challenges are disfavored for several reasons.  Claims of facial invalidity often rest on speculation[,] . . . raise the risk of premature interpretation of statutes on the basis of factually barebones records[,] . . . run contrary to the fundamental principle of judicial restraint[, and] . . . threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." (internal quotation marks and citations omitted)).

'the most difficult challenge to mount successfully'" and as presenting a "prohibitively high bar." *See NYSRP v. Cuomo*, 804 F.3d at 265 (quoting *Salerno*, 481 U.S. at 745).

To survive intermediate scrutiny, § 5-10 need only be substantially related to an important government interest. "It is beyond cavil that . . . states have 'substantial, indeed compelling government interests in public safety and crime prevention.'" *NYSRP v. Cuomo*, 804 F.3d at 261 (quoting *Kachalsky*, 701 F.3d at 97). And, in assessing whether a regulation such as § 5-10 reasonably fits this interest, a court must bear in mind that "[i]n the context of firearm regulation," the judiciary is not in the best position, relative to legislatures, "to make sensitive public policy judgments . . . concerning the dangers in carrying firearms and the manner to combat those risks." *See Kachalsky*, 701 F.3d at 97.

Measured against these familiar standards, § 5-10 survives Abekassis's facial challenge. Section 5-10 applies within New York City and implements N.Y. Penal Law § 400.00—New York State's statutory mechanism for firearms licensing—which, as noted, requires that an applicant, *inter alia*, lack convictions for felonies or serious offenses, be of good moral character, and be someone for "whom no good cause exists for the denial of the license." N.Y. Penal Law § 400.00(1)(b)–(c), (n). Section 5-10's "handgun-licensing scheme substantially relates to [the interest in public safety and crime prevention] because 'it is designed to promote public safety and prevent gun violence.'" *Toussaint*, 2018 WL 4288637, at *6 (quoting *Kwong*, 723 F.3d at 168). Section 5-10's requirement that an "applicant hav[e] a 'good moral character'" is clearly aimed at denying firearms to applicants who "would present a potential risk to the safety and security of the public if granted a license to possess a pistol." *See Aron*, 48 F. Supp. 3d at 374; *see also Bach v. Pataki*, 408 F.3d 75, 91 (2d Cir. 2005) (New York "has a substantial and legitimate interest . . . in insuring the safety of the general public from individuals who, by their

conduct, have shown themselves to be lacking the essential temperament or character which should be present in one entrusted with a dangerous instrument") (alteration in original) (citation omitted), *overruled on other grounds by McDonald*, 561 U.S. 742.  And the multiple factors that § 5-10 directs be considered as part of that inquiry, considered together, serve the interests in public safety and crime prevention "by limiting the issuance of permits to individuals whom the License Division deems are able to possess a handgun safely."  *Toussaint*, 2018 WL 4288637, at *6; *see also Mishtaku*, 2015 WL 13002182, at *6.  On its face, therefore, the § 5-10 regulatory scheme validly serves the important government interest of protecting the safety and security of the public by ensuring only law-abiding, responsible citizens possess firearms.

Apart from challenging § 5-10 as a whole, Abekassis contends that § 5-10(a), (h), and (n) are each separately facially invalid.  His attack misses the mark in two respects.  First, insofar as Abekassis attempts to isolate each factor as an inherently improper basis on its own to deny a handgun license, he ignores that, under § 5-10, no single factor is dispositive for the licensing officer's moral-character determination.  Indeed, even where multiple or all factors are present, the text of § 5-10 makes the denial of a license discretionary, not mandatory.  *See* 38 RCNY § 5-10 (providing that application "*may* be denied" after consideration of the 14 factors (emphasis added)).  Second, to the extent that § 5-10 leaves open the possibility that a license could be denied on the basis of a particular factor (whether viewed alone or in combination with others), there are clearly sets of circumstances in which each of the three factors may serve the interest of public safety and crime prevention so as to justify a license denial.  Specifically:

*Section 5-10(a)*:  This factor inquires whether an applicant "has been arrested, indicted or convicted for a crime or violation except minor traffic violations[.]"  38 RCNY § 5-10(a).  This factor advances the goal of public safety by identifying persons whose criminal records raise

26

doubt about their capacity and inclination to abide by the law and act responsibly.  In challenging this factor, Abekassis focuses on charges (*e.g.*, arrests) that did not result in a conviction.  In some instances, the bare fact of an earlier arrest may well not be illuminating as to an applicant's capacity to responsibly possess firearms.  But, as various courts have recognized, such charges and the circumstances underlying them, particularly when considered in combination with other § 5-10 factors, can shed light on whether an applicant has a suitable moral character or represents a threat to public safety.  *See, e.g.*, *Toussaint*, 2018 WL 4288637, at *6–7 & n.7 (upholding application of § 5-10(a) to applicant whose criminal record reflected arrests, not convictions); *Mishtaku*, 2015 WL 13002182, at *5–6 (same).  Abekassis's facial challenge to this factor therefore fails.

*Section 5-10(h)*:  This factor inquires whether the applicant "has a poor driving history, has multiple driver license suspensions or has been declared a scofflaw by the New York State Department of Motor Vehicles."  38 RCNY § 5-10(h).  It is of course easy to imagine cases in which behavior of this nature is not probative of an applicant's capacity for responsible and safe gun possession.  But on a facial challenge, that is not the proper question.  In particular cases, this data, too, has the capacity—including when viewed alongside other § 5-10 factors—to reveal whether the applicant has complied with, or disobeyed and disrespected, another state licensing scheme aimed at assuring public safety.  It, too, cannot be held facially invalid.

*Section 5-10(n)*:  This factor inquires whether "[o]ther information demonstrates an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or other good cause for the denial of the license."  38 RCNY § 5-10(n).  It is not clear whether Abekassis has abandoned his initial claim that § 5-10(n) is unconstitutional on its face, as he now admits that

"there may be circumstances warranting the denial of a handgun permit under § 5-10(n)."  Pl. Mem. at 15.  In any event, §5-10(n), too, is not facially invalid.  Gauging an applicant's respect for the law and concern for public safety are clearly substantially related to the state interest in assuring that licenses to possess firearms are issued to persons whose history reflects a responsible, safe temperament, and respect for the law.  This catch-all factor empowers the License Division to consider evidence bearing on these traits that does not fit among the earlier enumerated factors.  *Cf. Aron*, 48 F. Supp. 3d at 371–72 (finding that N.Y. Penal Law § 400.00(1) "was enacted to promote public safety and prevent crime," "substantially relates to the important governmental objective of ensuring that only law-abiding, responsible citizens are allowed to possess a handgun," and "constitutes a reasonable fit between New York's objective and the law").  Thus, it too is facially valid.

Accordingly, applying intermediate scrutiny, the Court holds that § 5-10—including the three factors challenged by Abekassis—manifests a reasonable fit between the goals of public safety and reduction of crime, on the one hand, and the regulatory scheme, on the other.  The Court denies Abekassis's facial challenge.[14]

---

[14] Abekassis notably does not argue that § 5-10 is procedurally defective, for example, by vesting unreviewable discretion in the licensing officer.  And such an argument would lack merit.  An applicant whose license is initially denied is not only able to appeal within the License Division, as Abekassis did, but also can thereafter bring an Article 78 proceeding, challenging the license denial as arbitrary and capricious in New York state court.  As one court has noted in refuting the argument that the statute affords inadequate remedies:

> The statute provides an unsuccessful applicant with an administrative appeal process, and that decision can be challenged in court in a CPLR Article 78 proceeding.  As the People state, "[i]f an applicant is unsatisfied with the judgment of Supreme Court, he/she is entitled, as of right, to appeal the final judgment of that court to the Appellate Division (CPLR 5701[a]), whose order is appealable, by permission, to the Court of Appeals. CPLR 5602(1)(a)" (Peo's Br. at 10).  The court's role in such an Article 78 proceeding is to ensure that the administrative

28

b.      *Abekassis's As-Applied Challenge*

Abekassis next contends that 38 RCNY § 5-10 is unconstitutional as applied to him.  *See*

Pl. Mem. at 4 n.1, 6; *see also* Compl. ¶¶ 107, 138–39.  The thrust of this argument is that even if

§ 5-10 may be constitutionally applied to bar others from possessing a firearm in the home, that

is not so here, because he does not have any criminal convictions, and the assembled conduct

such as his arrests, criminal summonses, and driving record on which the Licensing Officer and

Appeals Unit relied is insufficient to justify abridging his Second Amendment right.  *See* Pl.

Mem. at 9–10.

Abekassis's as-applied challenge gains considerably more traction than his facial

challenge.  That is because he does not have a felony conviction, established mental health or

substance abuse problems, or allegations of domestic violence.  In the limited federal cases

arising under § 5-10, these paradigmatic "red flags" are often cited as a basis for denying a

firearms license.  *See, e.g.*, *Toussaint*, 2018 WL 4288637, at *1 (denying carry handgun license

---

decision denying a petitioner a firearms license was neither arbitrary and capricious
nor an abuse of discretion. *Goldstein v. Brown*, 592 N.Y.S.2d 343 (1st Dep['t]
1993) . . . . [C]ontrary to defendant's claim, the discretion of a pistol licensing
officer to deny an application "is not unfettered, and the officials involved—
including the NYPD licensing division—are bound by standards reviewable in a
court of law" (Peo's Br. at 11).

*People v. Nivar*, 915 N.Y.S.2d 801, 808 (Sup. Ct., Bronx Cnty. 2011) (rejecting argument that
firearms license review process was under the "complete control and virtually unreviewable
discretion of the New York City Police Commissioner"); *see also Gurnett v. Bargnesi*,
47 N.Y.S.3d 173, 174 (4th Dep't 2017) (analyzing Article 78 claim challenging revocation of
gun license). For reasons that the record does not make clear, Abekassis did not bring an
Article 78 challenge to the denial of a license.  This case therefore does not present the issue
whether, in an Article 78 proceeding challenging the denial of a firearms license, the Second
Amendment requires a standard of review more demanding than the ordinarily applicable
arbitrary and capricious standard.  *See Nivar*, 915 N.Y.S.2d at 808 n.9; *see also Delgado v. Kelly*,
8 N.Y.S.3d 172, 172–73 (1st Dep't 2015) (applying "rational basis" standard to license denial in
Article 78 proceeding); *Kelly v. Klein*, 946 N.Y.S.2d 218, 219 (2d Dep't 2012) (applying
"arbitrary and capricious" standard to same).

where applicant had four felony arrests, a summons for an open-container violation, and had

been the subject of an order of protection); *Mishtaku*, 2015 WL 13002182, at *1 (denying

premises handgun license based on, *inter alia*, a prior arrest and a psychological evaluation from

which "the NYPD determined that Plaintiff was 'unsuitable for the position of Police Officer'"

(citation omitted)).   And some of the infractions cited in support of the license denial are fairly

viewed, individually, as minor.   Abekassis's case therefore comes closer than these precedents to

testing the outer reach of a locality's authority to deny a license for handgun possession in the

home under the Second Amendment.   His as-applied challenge presents, in this Court's view, a

close question.

      Nevertheless, the Court concludes that, on the unusual assemblage of facts that

Abekassis's license application presented, the License Division and Appeals Unit acted within

constitutional bounds in finding that he lacked the moral character to possess a gun and that he

had shown a "lack of concern[] for himself and others" inconsistent with licensure.   Importantly,

the Second Amendment right to individual gun possession as articulated in *Heller* and *McDonald*

is limited to "law-abiding, responsible citizens[.]"   *Bryant*, 711 F.3d at 369 (citation omitted).

Here, Abekassis's history reflects a litany of actual or alleged instances of failure to comply with

legal duties.   These include disregard of duties that implicated or potentially implicated public

safety.   In affirming the denial of the license, the Appeals Unit noted that Abekassis had been

arrested at age 15 for second-degree arson; that he had later been arrested for aggravated

unlicensed operation of a vehicle in the third degree, after which he pled guilty to a non-criminal

charge of operating a vehicle without a license; that he had received 14 moving violations; and

that his drivers' license had been suspended nine times (five for unpaid fines and four for non-

scofflaw reasons).  Also before the Appeals Unit—and implicitly relied insofar as the Appeals

Unit cited § 5-10(n)—were Abekassis's five criminal summonses, covering varied infractions.

This unusually long list of established or alleged non-compliance with legal duties was

reasonably viewed by the License Division and Appeals Unit as raising doubts about Abekassis's

character and his capacity for safe and responsible gun possession.  *See* 38 RCNY § 5-10

(instructing License Division to "consider all relevant factors").  To be sure, as Abekassis

emphasizes, some of these lapses were or appear to have been quotidian.  But even if no single

arrest or other infraction of his in isolation would have justified the denial of a gun license—a

question the Court has no occasion to consider—viewed holistically, Abekassis's history of

serial disregard for laws and regulations justified concerns about his capacity for self-restraint.  It

fairly raised doubts within the License Division and Appeals Unit about whether he would

scrupulously comply with important legal duties implicating public safety.  It fairly called into

question whether he would be similarly inattentive to both the important restrictions associated

with a gun license and to the safety of others in his vicinity.  *See Toussaint*, 2018 WL 4288637,

at *4 & n.6, 6 (upholding application of § 5-10(a) to deny firearm license to applicant who had

four arrests, none resulting in a criminal conviction and all over 10 years old).[15]

---

[15] *Cf. Tuttle v. Cacace*, 81 N.Y.S.3d 195, 196 (2d Dep't 2018) (affirming denial of pistol license under N.Y. Penal Law § 400.00(1) based on applicant's five arrests, two of which he failed to report on his application, and explaining that "[t]he fact that the charges against the petitioner were dismissed and/or adjourned in contemplation of dismissal and eventually dismissed does not disqualify the circumstances surrounding the arrests from consideration"); *Karagolian v. Walsh*, 966 N.Y.S.2d 518, 519–20 (2d Dep't 2013) (affirming suspension of pistol license under N.Y. Penal Law § 400.00(1) where applicant had been arrested on charges of resisting arrest, obstructing governmental administration, and harassment, and had separately been arrested for driving while intoxicated); *In re Idlett*, No. A-2415-14T3, 2016 WL 2745907, at *1–2 (N.J. Super. Ct. App. Div. May 12, 2016) (reversing approval of handgun permit based on applicant's "atrocious" driving record—which included, *inter alia*, 16 speeding tickets, 15 license suspensions, numerous citations (including with a suspended license), and a citation for

The NYPD License Division and Appeals Unit thus were within bounds to conclude that "by [his] conduct, [Abekassis] ha[s] shown [himself] to be lacking in the essential temperament or character which should be present in one entrusted with a dangerous instrument." *Bach*, 408 F.3d at 91 (citation omitted).  In intermediate scrutiny terms, there was a reasonable fit between denying Abekassis's license based on the evidence before the License Division and Appeals Unit and the constitutionally permissible objective of protecting the public's safety and security by limiting possession of firearms to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635.

Therefore, the Court holds that § 5-10 was constitutionally applied to Abekassis, and denies his as-applied Second Amendment claim.[16]

---

fictitious license plates months before he submitted his permit application—because it "demonstrated him unfit [to possess a handgun] under the health and safety exception" of New Jersey law); *In re Banic*, No. A-0829-08T4, 2009 WL 2579436, at *1–2 (N.J. Super. Ct. App. Div. Aug. 24, 2009) (affirming denial of duplicate firearms purchaser identification card under New Jersey law because issuance of such a card was not "in the interest of the public, health, safety or welfare" where applicant had been arrested, had a lengthy poor driving record, pled guilty to a petty disorderly persons offense as "a young man," and—although disputed by the applicant—lied about that plea in his permit application); *Boss v. Dudley Dist. Ct.*, No. 08 Civ. 2762 (DJC), 2009 WL 4894341, at *2 (Mass. Super. Nov. 18, 2009) (upholding machine gun license denial under Massachusetts law, where applicant had 17 speeding infractions, two drunk driving charges, and nine license suspensions, and observing that "[t]his profile does not comport with that of the ordinary motoring public" and that "it is reasonable to deny a gun license based on a criminal charge that was ultimately dismissed," as "[t]he goal of firearms control . . . is to limit access to deadly weapons by irresponsible persons" (citation omitted)).

[16] Abekassis's Complaint also alleges that portions of the New York State licensing scheme that impose criminal penalties for possessing a gun without a license are unconstitutional.  *See* Compl. ¶¶ 140–43 (citing N.Y. Penal Law §§ 265.01(1), 265.01-b, 265.02(5)(i), 265.04(2), and 265.15(6)).  As formulated in the Complaint, however, this claim is derivative of Abekassis's claim that he was unconstitutionally denied a premises handgun license. *Id.* ¶ 42.  Accordingly, because the Court dismisses Abekassis's facial and as-applied challenges to § 5-10, the Court denies his challenge to the state penalty provisions as well.

### C.       Supplemental Jurisdiction for the Preemption Claim

The Court finally considers Abekassis's claim that 38 RCNY § 5-10 is preempted by New York State law—specifically, Penal Law § 400.00. *See* Compl. ¶¶ 144–46; Pl. Mem. at 21–22. He argues that § 5-10 impermissibly expands the "moral character" and "other good cause" analyses envisioned by state law. *See* Pl. Mem. at 21. Defendants argue that in the absence of viable federal claims, the Court should decline to exercise supplemental jurisdiction over this state-law claim. *See* Def. Mem. at 14–15. The Court agrees and dismisses this claim without prejudice to Abekassis's ability to bring such a challenge in state court.

Federal district courts have supplemental jurisdiction over non-federal-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, a district court may, at its discretion, "decline to exercise supplemental jurisdiction over a claim" under any of four circumstances: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).

The Supreme Court and the Second Circuit have instructed that, in deciding whether to exercise supplemental jurisdiction, a district court should balance the traditional "values of judicial economy, convenience, fairness, and comity," *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988), and that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well,'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Although the exercise of supplemental jurisdiction is discretionary, the ordinary case "will point toward

declining jurisdiction over the remaining state-law claims." *Id.* (quoting *Cohill*, 484 U.S. at 350 n.7).

Here, no circumstances counsel in favor of exercising supplemental jurisdiction over Abekassis's remaining state-law claim, given the Court's dismissal of all of Abekassis's federal claims. To the contrary, the Complaint itself recognizes the complexity of New York State's licensing scheme, describing N.Y. Penal Law § 400.00 as "very comprehensive," "by its detailed nature, le[aving] no room for local ordinances," and giving localities "detailed instructions." Compl. ¶¶ 114, 120. The interaction of the New York State gun licensing scheme and New York City's complementary regulatory scheme, and whether the latter is in conflict with the former, presents a "novel or complex issue of State law." *See* 28 U.S.C. § 1367(c)(1); *see also Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 124 (2d Cir. 2006) ("[A] district court particularly abuses its discretion when it retains jurisdiction over state-law claims raising unsettled questions of law following dismissal of all original-jurisdiction claims."). There is no occasion for this federal Court to take on those purely state-law issues. Particularly with the Court's having dismissed Abekassis's federal claims at the threshold, the factors of convenience and fairness do not favor the exercise of supplemental jurisdiction to consider Abekassis's state-law preemption claim, and the factor of comity affirmatively disfavors doing so. The Court accordingly declines to exercise supplemental jurisdiction over Abekassis's state-law preemption claim. That claim is dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss in full. The Court dismisses Abekassis's federal claims, with prejudice, and dismisses Abekassis's state-law preemption claim, without prejudice to his right to bring such a claim in state court.

The Court respectfully requests that the Clerk of Court terminate the motion pending at docket 12 and close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 7, 2020
New York, New York